**GRAYBAR ELECTRIC CO., INC.**

v.

**Hollis R. SAWYER.**

Supreme Judicial Court of Maine.

Argued Sept. 14, 1984.

Decided Jan. 3, 1985.

Murray, Plumb & Murray, Ellyn C. Ballou (orally), John Lightbody, Portland, for plaintiff.

Saturley, Hoglund & Savasuk, Michael J. Pearce (orally), Richard E. Poulos, Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

Plaintiff Graybar Electric Co., Inc. ("Graybar"), an electrical equipment and parts supplier, filed suit in Superior Court (Cumberland County) on August 26, 1981, seeking to recover the purchase price of equipment it had delivered to a third party on credit, allegedly with the oral guarantee of defendant Hollis R. Sawyer. Following

a jury trial and the entry of judgment for plaintiff in the amount of $30,203.25, defendant Sawyer brings this appeal. Graybar cross-appeals from the Superior Court's denial of attorney's fees and interest. We deny both the appeal and the cross-appeal and accordingly affirm the judgment below.

### Facts

For some years prior to 1978, Pine Tree Electric Company, Inc. ("Pine Tree"), an electrical contractor, bought electrical equipment and supplies from Graybar. Sometime in 1977 or 1978, when Pine Tree failed to pay its bills on time, Graybar cut off credit sales to Pine Tree. In the spring of 1980, Paul St. Pierre, co-founder and half-owner of Pine Tree, solicited $30,000 from each of three promising Pine Tree employees in order to help Pine Tree's cash flow situation. The employees were to receive status in the company commensurate with their investments. One of those employees approached his father-in-law, defendant Sawyer, about financing his contribution.

After investigating Pine Tree, Sawyer invested $100,000 in the company himself. It seemed clear to Sawyer, who was a respected businessman, that Pine Tree was a basically sound contracting firm in need of more capital and of a knowledgeable hand controlling its finances. Therefore, before investing, Sawyer required that Pine Tree hire a comptroller. That it did. Sawyer's investment was also accompanied by a complete reorganization of the company, in which he ended up as the sole preferred stockholder with all of the voting power. He also elected himself vice president of Pine Tree, although he was not at the firm on a day-to-day basis and he spent weeks at a time in Florida. Over the course of the summer and fall of 1980, he lent large amounts to Pine Tree, until his advances totaled almost $300,000.

On July 7, 1980, Sawyer and two others from Pine Tree met at Pine Tree's offices with representatives of Graybar, including its finance manager, P.M. Nicholas. The purpose of the meeting was to get reacquainted and to establish a basis for again doing business. As a result of the meeting, Graybar reopened Pine Tree's credit account.

When Pine Tree made no payment on its account in August and early September that same year, Graybar became concerned and placed a hold on Pine Tree's pending orders, including a $30,000 telephone switch, which Pine Tree was under contract to install in the Lewiston Dial Exchange Building of New England Telephone Company. To straighten out the credit problem, Pine Tree arranged another meeting for September 18 among the same individuals who had attended the first meeting. The jury heard testimony that at that second meeting, Sawyer told Nicholas and the other Graybar representatives, in effect, that if Pine Tree did not pay its account he would arrange to have it paid. He also gave Graybar's representatives a list of telephone numbers where they could reach him directly in the event any problem arose. They also heard testimony that five days after the September 18 conference Nicholas wrote Sawyer a letter memorializing Graybar's understanding of the outcome of their discussions.

Following the meeting Graybar again reopened Pine Tree's line of credit. Pine Tree made payments on its account through February of 1981. Graybar delivered the telephone switch to Pine Tree in March. However, Pine Tree never paid for it. Graybar in June filed a materialman's lien against the New England Telephone building in Lewiston where Pine Tree had installed the switch; but the 90-day lien period had already expired so the lien was not perfected. Plaintiff and Pine Tree's other creditors forced Pine Tree into involuntary bankruptcy a month after Pine Tree closed its doors in June of 1981. The present suit, in which Graybar alleges that

Sawyer personally guaranteed Pine Tree's account, followed. The jury by special verdict found 1) that Sawyer had promised to pay the Pine Tree account at Graybar, 2) that Sawyer's promise fell within the "main purpose" exception to the Statute of Frauds, and 3) that Sawyer should not be released from his promise because of any failure on Graybar's part to act in a reasonable manner in trying to collect the Pine Tree account. The Superior Court entered judgment accordingly. It did not, however, permit Graybar to recover either attorney's fees or interest.

On appeal, defendant Sawyer assigns various grounds for reversal, which we will consider *seriatim.* On its cross-appeal Graybar assigns two alleged errors. We deny the first relating to attorney's fees and interest, and we do not reach the other since we affirm the judgment in Graybar's favor.

### I. *Admission of Carbon Copy of Letter*

At trial the presiding justice allowed in evidence Graybar's file copy of a letter that according to his trial testimony Nicholas sent to Sawyer only five days after the September 18 meeting. In that letter Graybar's financial manager recited as fact that Sawyer had on September 18 personally guaranteed Pine Tree's debt incurred for material shipped to it by Graybar, including that for the New England Telephone project.[1] Sawyer, who claims never to have received the Graybar letter, contends that the best evidence rule, M.R.Evid. 1002,

bars the admission of the carbon copy. The presiding justice concluded that the copy came within an exception to the rule requiring an original, and we find no error in his decision.

■■■■ The contents of a writing may be proved by evidence other than the original document itself, if the original has been lost or destroyed, M.R.Evid. 1004(1), or if the original is in the hands of the party against whom the copy is offered and that party after notice has failed to produce the original, M.R.Evid. 1004(3). It is within the discretion of the trial judge to decide whether an exception to the best evidence rule applies in a given instance. His decision is reviewable only for an abuse of that discretion. *See State v. Williams,* 395 A.2d 1158, 1162–63 (Me.1978); Field & Murray, *Maine Evidence* § 1004.0, at 272 (1976). No such abuse of discretion is shown here. The trial testimony established a sufficient foundation of transmission of the letter through the mails. By that testimony, the letter was addressed to Sawyer and placed in the mail according to Graybar's usual practices. Evidence that a letter was mailed raises a presumption of receipt by the addressee. *Perry v. Park Street Motor Corp.,* 127 Me. 365, 368, 143 A. 274, 275 (1928). Since defendant did not offer the original letter, there is thus a sufficient foundational basis for application of M.R.Evid. 1004(3). If, on the other hand, the trial justice chose to believe that Sawyer did not receive the letter, then he

---

1. Graybar's letter read in full as follows:

September 23, 1980

Dear Hollis,

Thank you for taking time out of your valuable day to meet with Bob, George and me to discuss future business with the Pine Tree Electric Co.

We fully understand your concern about placing a hold on shipments during the course of a project which would create serious problems for your company. However, I want to re-emphasize the importance of our receiving prompt payments that we discussed.

Based on your willingness to have us contact you directly and your personal guarantee

of payment; we will be happy to continue shipments to Pine Tree Electric.

We will now release the shipment of material on the N.E. Telephone project at Lewiston.

If timely payments are not received; we will contact you before placing a hold on shipments.

Again, Hollis, thank you and we look forward to a mutually beneficial business relationship in the future.

Respectfully yours,

P M Nicholas

Financial Manager

would have been justified in applying M.R. Evid. 1004(1). In neither case would there have been an abuse of discretion. The carbon copy of the September 23, 1980, letter thus was properly found to come within an exception to the best evidence rule.

■ Even if the carbon copy was in a form to be admitted in evidence, Sawyer contends that the letter should have been excluded as self-serving hearsay. We reject that contention on alternative grounds. If Sawyer received the letter, it was properly admissible on the principle of adoptive admission. This court in *Ross v. Reynolds*, 112 Me. 223, 226, 91 A. 952, 953 (1914), had the following comment that is pertinent here:

> Such a letter is clearly admissible. Though in a sense self-serving, it is admissible because, if the charge contained in it is untrue, it is calculated to evoke a reply. If no reply is made, that fact, unexplained, may afford an inference that the charge is true.

*See* M.R.Evid. 801(d)(2)(B); Field & Murray, *Maine Evidence* § 801.5, at 194 (1976) (adoptive admission may arise from silence). Alternatively, the September 23, 1980, letter written by Graybar's representative who later testified at trial was admissible, under the last sentence of M.R.Evid. 801(d)(1), "to rebut an express or implied charge against him of recent fabrication" of his claim that Sawyer orally guaranteed the payment of Pine Tree's debt.

## II. *Trial by Consent of Guarantee Issue*

Sawyer next contends that the jury should not have been allowed to decide whether a binding contract of guarantee existed between himself and Graybar because that question was not explicitly raised in the pleadings.

■ Sawyer never made any such contention in the Superior Court, and hence it is not open to him to press it belatedly on appeal. *State v. Thornton*, 485 A.2d 952, 953 (Me.1984); *State v. Desjardins*, 401 A.2d 165, 169 (Me.1979); *Harrington v. Town of Garland*, 381 A.2d 639, 642–43 (Me.1978). Even if we were to consider the contention, we would reject it. From the record it is clear that the question of the existence of a contract of guarantee was tried by mutual implied consent of the parties, and hence was properly submitted to the jury under M.R.Civ.P. 15(b). Sawyer's own proposed jury instructions, motion for judgment n.o.v., and most of the other documents that he filed in the trial court are framed in terms of a third-party contract of guarantee.

## III. *Existence and Enforceability of Oral Guarantee*

Sawyer argues that his motions below for directed verdict, for judgment notwithstanding the verdict, and for a new trial, all of which were denied, should have been granted for one or more of the following reasons: by the only reasonable view of the evidence 1) no contract of guarantee was formed; 2) the present suit is barred by the Statute of Frauds; and 3) Sawyer was discharged as a matter of law from any duty he may have owed Graybar because of Graybar's failure to perfect its materialman's lien.

It is not our function on appeal to supplant the findings of the jury with our own interpretation of the evidence. Nevertheless, if the evidence is not susceptible of any reasonable interpretation that would support the jury's conclusions, then we may overturn its verdict. Such is not the case here.

### A. *Existence of Oral Contract of Guarantee*

■ Taking the evidence in the light most favorable to Graybar, we confront the issue whether a jury rationally could find

by a preponderance of the evidence that a binding contract of guarantee existed between it and Sawyer. We hold that it could. As evidence showing the existence of a binding contract of guarantee, the jury could consider the September 23, 1980, letter from Graybar's finance manager to Sawyer; the testimony of three witnesses that Sawyer had orally promised to pay the Pine Tree account if Pine Tree did not; the testimony of a fourth witness that Sawyer said he "would take care of" any problems with payment of Pine Tree's account with Graybar; and the course of conduct followed by Graybar after the second meeting, including its refraining from placing a lien on the Pine Tree job in Lewiston. That evidence was sufficient to warrant the jury's conclusion that such a contract was in fact made.

### B. *"Main Purpose" Exception to the Statute of Frauds*

■ Title 33 M.R.S.A. § 51(2) (1978) provides that "no action shall be maintained in any of the following cases: ... to charge any person upon special promise to answer for the debt, default, or misdoings of another ... unless the promise, contract or agreement ... is in writing and signed by the party to be charged therewith." This traditional component of the Statute of Frauds has, however, long been subject to an exception in a case where the promisor's main purpose in making his promise is to secure some benefit for himself. *See Emerson v. Slater*, 63 U.S. (22 How.) 28, 16 L.Ed. 360 (1859); *Davis v. Patrick*, 141 U.S. 479, 12 S.Ct. 58, 35 L.Ed. 826 (1891).

That so-called main purpose exception to the Statute of Frauds was first applied in Maine in *Colbath v. Everett B. Clark Seed Co.*, 112 Me. 277, 91 A. 1007 (1914). In *Colbath*, the plaintiff refused to send one Mr. Klippel a shipment of potatoes because Klippel was reputed to be "no good financially." The defendant seed company, to which Klippel was supposed to supply the potatoes, contacted the plaintiff and agreed that it would pay for the potatoes if Klippel did not because the defendant needed to have the potatoes. The potatoes were delivered directly to the defendant, bypassing Klippel altogether. The court held that the element of benefit to the defendant was so plainly apparent that his promise was taken out of the Statute of Frauds.

In *Maine Candy and Products Co. v. Turgeon*, 124 Me. 411, 130 A. 242 (1925), this court again held that a promise, though made in the form of an agreement to answer for the debt of another, was nevertheless outside the Statute of Frauds when based upon a consideration flowing directly to the promisor.

In *Starkey v. Lewin*, 118 Me. 87, 90, 105 A. 858, 860 (1919), another case involving the main purpose doctrine developed in *Colbath*, the court held that it was necessary in such a case that the jury be instructed to examine whether the indirect benefits to the promisor were sufficient to constitute consideration for the promise.

More recent formulations of the rule have abandoned the theory that the main purpose exception enforces an original promise in favor of the idea that the promise, though collateral, is enforceable because the promisor does not need the protection against his own generous impulses afforded by the Statute of Frauds. *Restatement (Second) of Contracts* § 116 (1981). Where a surety's main objective is to serve his own pecuniary or business advantage, the gratuitous element of the suretyship is eliminated, the likelihood of disproportion in the values exchanged is reduced, and the context of commercial dealings provides evidentiary safeguards. *Id.*, comment a.

■ Both the common law rule and the Restatement formulation focus on whether the evidence adduced at trial justifies the conclusion that the promisor's main purpose was to advance his own interests.

The benefit that a promisor must expect to receive under the main purpose rule in order to be held to his promise must be substantial, immediate, and pecuniary, though it may flow to the promisor through benefit to the principal obligor. *See id.,* comment b. That is, although the promisor need not receive cash in hand from the promisee, the path of benefits flowing to the promisor must not be so circuitous or uncertain that obtaining those benefits cannot be said to have been his main purpose in making the promise. As a matter of practicality, the promisor's advantage must be served in a straightforward way in order for the main purpose rule to apply.

 The jury instructions in the present case gave a thoroughly adequate statement of the law on the main purpose rule. In the course of charging the jury, the presiding justice made clear that "Mr. Sawyer is not responsible for the debts of Pine Tree that Pine Tree incurred in the ordinary course of its business just because Mr. Sawyer was a shareholder." For Sawyer to be held liable, the justice stated: "Graybar must prove by a preponderance of the evidence that Mr. Sawyer made a promise guaranteeing payment and had as his main purpose, in making it, the achievement of a substantial, *direct*, immediate, personal monetary benefit for himself as opposed to Pine Tree." (Emphasis added) The instructions as a whole were sufficient to inform the jury of the applicable law on the subject of the main purpose exception.[2]

 The evidence before the jury amply supports its finding, under the instructions, that Sawyer intended by his promise to procure an immediate and substantial benefit flowing directly to himself. Sawyer had outstanding loans to Pine Tree of almost $300,000. He admitted in testimony that he needed to keep the business going in order to be paid back. The activities he undertook to get the business back on its feet financially were extensive. He followed upon his initial loan of $100,000 by lending Pine Tree further large sums of money with the obvious purpose of keeping jobs going. He structured the loan transactions to give himself, as the sole voting stockholder, all of the authority formerly held by the board of directors. He reserved to himself the control of Pine Tree's borrowing. He guaranteed letters of credit necessary for Pine Tree to obtain two other jobs. He elected himself vice president, and had an active hand in rejecting jobs and meeting with suppliers, and he maintained his involvement even while he was in Florida for substantial periods of time. He received interest on his loans to Pine Tree through the fall and winter of 1980 and the spring of 1981. He also received $18,000 in April of 1981 in partial repayment of the principal amount of the loans. He testified at length about his desire to increase Pine Tree's profitability so that he could be paid back. Graybar's Nicholas in his September 23, 1980, letter to Sawyer noted Sawyer's concern that delays in shipment of supplies to Pine Tree would create "serious problems for your company." Sawyer also stood to benefit in his capacity as sole preferred stockholder from any increase in the net worth of the company and from the quarterly dividends that Pine Tree was required to pay to him.

In view of the necessity of maintaining the flow of supplies to Pine Tree in order to keep the business going, and the necessity of its staying in business if Sawyer was to be repaid, the jury could reasonably find that Sawyer's oral promise, given to avoid serious difficulties for Pine Tree, was intended to confer on him a direct and substantial benefit. Though the evidence does not conclusively establish Sawyer's motiva-

---

**2.** In fact, the court below, by requiring an intended *direct* benefit to the guarantor, required the jury to find more than strictly necessary under *Restatement (Second) of Contracts* § 116, in order to hold defendant to his oral promise.

tion in guaranteeing the Pine Tree account, it is sufficient to raise a jury question under the main purpose rule.

The facts of the present case resemble closely those of the cited Maine cases and are well within the purview of the rule as contemplated in the *Restatement*. In the *Maine Candy* case, for example, the promisor gave an oral promise of payment of past debts to keep the business going so that he could recover his own investment. Illustrations 2 and 4 of *Restatement* § 116 say that promises should be enforceable against a creditor trying to protect his security by orally guaranteeing the debt of another, or of a substantial shareholder in a bank protecting the bank from official examination so as to keep it afloat. Comparison of the present case with those authorities [3] demonstrates that it falls within the accepted ambit of the main purpose doctrine.

### C. *No Discharge of Guarantee by Graybar's Failure to File a Timely Lien*

■ Sawyer claims that Graybar's failure to perfect a mechanics lien on the job for which the telephone switch was ordered entitles him as a matter of law to be relieved *pro tanto* of any duty he might otherwise have owed Graybar as a guarantor. According to the trial evidence, however, part of the understanding between the parties was that Graybar would not place liens on Pine Tree jobs without first consulting Sawyer. There was also evidence that Graybar made several unsuccessful attempts to have Sawyer address the Pine Tree problem while the lien period was still running. That evidence raises a jury question whether it was reasonable for Graybar to act as it did in forebearing

to lien the Lewiston Telephone Company building. This question was explicitly submitted to the jury in the court's instructions, and it was specifically answered by the jury in its negative response to question 3 on the verdict form: "Should Mr. Sawyer be released from his guarantee on the grounds Graybar did not act in a reasonable manner in attempting to collect the Pine Tree account?"

The treatment of this issue as a factual question to be decided by the jury was entirely appropriate. Given the testimony in the case, there could be no discharge of Sawyer as a matter of law. The jury had ample evidence to support its conclusion that Graybar was not unreasonable in the actions it took to protect itself through other means than coming back to Sawyer's guarantee.

### IV. *Graybar's Cross-Appeal for Attorney's Fees and Interest*

■ Graybar has cross-appealed from the trial court's exclusion of evidence that Graybar wished to present as to the *amount* of attorney's fees and interest it claimed were due from Pine Tree. However, at trial Graybar laid no foundation for the introduction of that evidence. The presiding justice implicitly found that Graybar had presented no evidence from which the jury could find that Sawyer's oral guarantee extended beyond the purchase price of the goods delivered to Pine Tree. On appeal we cannot say that the justice's finding was clearly erroneous. In that circumstance, the presiding justice quite properly refused to admit evidence as to the *amount* of attorney's fees and interest that Pine Tree would owe. The justice's caution was especially justified here, where any award of attorney's fees and interest

3. *See also Merrill v. Kirkland Constr. Co., Inc.,* 365 Mass. 110, 310 N.E.2d 106 (1974); *Otto Contracting Co., Inc. v. S. Schinella & Son, Inc.,* 179 Conn. 704, 427 A.2d 856 (1980); *Farr & Stone Ins. Brokers v. Lopez,* 61 Cal.App.3d 618, 132 Cal.Rptr. 641 (1976); *Howard M. Schoor Associates, Inc. v. Holmdel Heights Constr. Co.,* 68 N.J. 95, 343 A.2d 401 (1975); and *Wilson Floors Co. v. Sciota Park Ltd.,* 54 Ohio St.2d 451, 377 N.E.2d 514 (1978).

would also have to qualify for exception from the Statute of Frauds under the main purpose rule. The cross-appeal must therefore fail.

The entry is:

Judgment affirmed.

All concurring.