759 N.W.2d 447 (2008)
276 Neb. 867
Chris W. CHRISTIAN and Tabitha Christian, Husband and wife, appellees and cross-appellants,
v.
Bert SMITH IV, appellee and cross-appellee, and
B4 Cattle Company, Inc., appellant and cross-appellee.
No. S-07-215.
Supreme Court of Nebraska.
December 12, 2008.
*453 John C. Hahn, Lincoln and Brett T. Daee, of Jeffrey, Hahn, Hemmerling & Zimmerman, P.C., for appellant and for appellee Bert Smith IV.
Edward F. Fogarty, of Fogarty, Lund & Gross, Omaha, for appellees Chris W. Christian and Tabitha Christian.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

I. NATURE OF CASE
This case involves an oral contract. The dispute involves the terms of the oral contract and whether the oral contract was between Chris W. Christian and Bert Smith IV or between Christian and B4 Cattle Company, Inc. (B4), Smith's corporation. Smith claims that the oral agreement was between Christian and B4. Under the terms of the oral agreement, Christian would borrow money from the Citizens National Bank of Wisner, Nebraska (CNBW), to purchase and feed cattle on behalf of Smith or B4. In exchange for the use of Christian's credit line, Smith or B4 promised to pay Christian a fee for each lot of cattle purchased. Christian's line of credit was also used to purchase feed for the cattle, and the debt incurred from the purchase of feed was to be paid using the money from the eventual sale of the cattle. The parties disagree whether Smith or B4 promised to pay the line of credit should the proceeds from the sale of the cattle be insufficient for Christian to do so. The cattle sales were insufficient to pay the lines of credit, Christian defaulted on the loan, and CNBW obtained a judgment against him. Smith and B4 refused to indemnify Christian, and Christian filed this breach of contract claim. Christian contends that B4 was the alter ego of Smith and that the corporate existence of B4 should be disregarded.

II. BACKGROUND
Christian and Smith were longtime friends who grew up together in Tennessee. Christian is a full-time physical therapist who occasionally hauls hay or cattle. Smith has been in the cattle business all of his life. Smith claims that in entering into the oral agreement with Christian, he was acting on behalf of B4. Smith incorporated B4 in 2001 in Virginia. He is the president and sole stockholder of B4. Smith testified that he is the sole member of the board of directors of B4 and holds "[a]ll positions" of B4. Smith divides his time between Tennessee and Virginia. Christian lives in Tennessee.

1. ORAL AGREEMENT
It is undisputed that in the spring of 2003, Christian and Smith had a telephone conversation about a possible arrangement in which Smith or B4 would use Christian's line of credit to purchase, feed, and care for cattle. Christian testified that Smith or B4 wanted to use Christian to borrow money because Smith or B4 could not get any more credit. Smith proposed that in exchange for the use of Christian's credit line, Smith or B4 would pay Christian a fee, that the parties call a "commission," for each lot of cattle purchased. The exact amount of the fee is disputed. Smith claims the fee was $250, while Christian claims it was $500. The debt on Christian's line of credit was to be paid off using the money from the eventual sale of the cattle.
Under their agreement, Christian would borrow the money from CNBW. The loans for the purchase of the cattle would be in Christian's name, and the cattle would also be titled in Christian's name. The cattle would be kept and cared for at feedlots *454 owned and operated by Max Kant in Norfolk, Nebraska. Smith would make all management decisions concerning the purchasing and feeding of the cattle.
According to Christian, he "just wanted the commission off of it" and Smith would take "all profit and all loss." Smith, on the other hand, testified that there was never a meeting of the minds on profits and losses. Smith testified that they agreed to talk about profits and losses later. In his deposition, however, portions of which were read into the record at trial, Smith stated that Christian "`assumed that if I was getting the profit that I would take the loss.'"
Pursuant to their oral agreement for the Nebraska-fed cattle, Christian established three lines of credit with CNBW as follows: (1) August 2003, $925,000 accruing interest immediately at 6.25 percent; (2) August 2003, $178,000 accruing interest immediately at 6.25 percent; and (3) October 2003, $112,850 accruing interest immediately at 6.5 percent. All three lines accrued interest at maturity of 16 percent per annum.
Once the first line of credit was established, Smith, or Smith on behalf of B4, began using it to fund the location and purchase of cattle. Under the usual procedure, Smith would locate, select, and sort cattle. Once the cattle were chosen, Smith would fax a handwritten invoice to Christian, who would write a check for the purchase price. Smith's father would usually pick up Christian's check and send it to the seller. Christian would then be reimbursed plus the "commission." Christian testified that his account was often overdrawn because Smith was slow in sending the reimbursement checks. After about 3 months, Smith or B4 stopped buying cattle.
Christian's line of credit continued to be used to pay for the ongoing care of the cattle on Kant's feedlot. Kant had the authority to draw on Christian's credit line to pay for feed. If any of the fattened cattle were sold, Kant would apply the proceeds to pay down Christian's credit line.
If there was excess money remaining after the credit line was paid, the arrangement was that Kant would send the profits "back to Tennessee." Kant testified that on only one occasion were there excess profits after paying the credit line. Kant testified that he sent those profits, around $28,000, to Smith. Christian testified that he was never informed of nor received any portion of those profits. He thought this was proper because, under their agreement, the profits were Smith's. Christian stated that "it was defined to me that [Smith] got all profits and all losses and all I got was the commission per load." Smith acknowledged at trial that he had testified in his deposition that he was to receive the profits, if any, from the arrangement with Christian.
The cattle were titled in Christian's name, and the signed CNBW loan documents stated that Christian was not acting as a straw man for anyone. Nevertheless, Christian testified that the agreement was that Smith owned the cattle. Smith likewise admitted at trial that the cattle were actually owned by him. In his testimony, Smith would not refer to B4 as owning the cattle, but would always say that they were owned by him.
Kant, the feedlot owner, also testified that Smith was the owner of the cattle purchased with Christian's line of credit. To ensure that the feedlot record of ownership was correct, Smith had sent a fax to Kant requesting the feedlot to change all cattle titled in Christian's name to Smith's name. After receiving the written request, *455 Kant updated his records to reflect that Smith was the owner of the cattle.
Eventually, all the cattle that had been financed using Christian's line of credit were sold. The sales were insufficient to pay the lines of credit, and Christian defaulted. Christian testified that after CNBW called to inform him that he owed $168,000, Christian alerted Smith. Christian testified that Smith said, "Don't worry about it, they'll probably just role [sic] it over into my debt." Christian had no further discussions with Smith until CNBW sued Christian on June 7, 2004. Upon receiving the complaint, Christian faxed it to Smith. Although Smith was not a party to the action, he told Christian he would help Christian find an attorney in Nebraska and assist Christian "with some money." Christian and CNBW settled the case, and on January 5, 2006, CNBW took judgment of $168,000 with 16 percent interest.
After the judgment was entered, CNBW began to execute on the judgment by levying Christian's bank accounts and garnishing his wages. At the time of trial, $20,060.29 had been taken from Christian. Because Christian did not have enough money to pay the judgment, CNBW pursued Kant, who was a signed guarantor on Christian's line of credit. Eventually, Kant paid CNBW $130,000 and was assigned the $169,379 judgment against Christian. Kant also received the ongoing garnishment against Christian's checking account.

2. TRIAL
Christian brought a claim against Smith and B4 in the district court for Cuming County, Nebraska, for breach of the alleged agreement to hold him harmless for any losses resulting from the cattle transactions. Christian styled his complaint as against "Bert Smith IV and B4 Cattle Company." In the body of the complaint, it alleges that Smith and B4 "wanted to increase the number of cattle they had on feed in Nebraska" and that Smith, "in his personal capacity, asked his life long friend, Chris Christian, to enable him to do this."
On the day before the trial, B4 moved to dismiss, arguing that the suit was not brought under the correct choice of law. B4 argued that Tennessee law, not Nebraska law, was the appropriate law to govern this action, because Tennessee had a more significant relationship to the transaction and the parties. Christian responded that most of the contacts surrounding the case were in Nebraska and that therefore Nebraska law was the correct choice of law. Christian also argued that regardless of the choice of the law, the statutes of frauds in Nebraska and Tennessee are essentially the same. The district court overruled B4's motion regarding choice of law and applied Nebraska law to the claim.
B4 also filed a motion to dismiss under the doctrine of forum non conveniens on the day before trial. The court overruled the motion, because the parties and witnesses were already in Nebraska ready for trial. The court noted that the motion might have had more weight if it had been raised earlier in the case.
B4 had previously filed a motion in limine to exclude evidence showing that Smith offered to pay the legal fees of Christian in the CNBW suit or evidence of indemnification of Christian by Smith. That motion was overruled. At trial, however, the judge sustained B4's objection that evidence of a settlement offer by Smith had no probative value. The court still allowed the jury to consider, over B4's objection, evidence that Smith had offered to help Christian with legal fees in relation to CNBW's suit against him.
*456 At the close of the evidence, Christian filed three motions: (1) a motion for directed verdict against both Smith and B4 for $168,000 plus interest, (2) a partial directed verdict that B4 and Smith were jointly liable because B4 was merely the alter ego of Smith, and (3) a motion to advise the jury that the agreement between Smith and Christian did not need to be in writing. The court overruled the motion for directed verdict, because the existence of a contract was "clearly a jury question.... So as to what the amount would be is certainly premature." The court granted a motion made by Smith for a directed verdict, stating: "I'm going to sustain the motion for directed verdict filed by the defendant Bert Smith IV so that the party remaining as defendant in this action that will go to the jury is B4 Cattle Company, Inc." As a result, B4 was the only defendant whose liability was submitted to the jury. Finally, the court determined that the alleged oral agreement was outside the statute of frauds as a matter of law. Therefore, the court did not instruct the jury on the defense.
The jury returned a verdict in favor of Christian in the amount of $130,000. Christian made a motion to amend the judgment to award $168,000 instead of $130,000. The court overruled the motion, stating that there was "no reason to go in and affect the jury's verdict," because the $130,000 amount was "within the evidence that was offered." B4's motion for a new trial was overruled.
B4 appealed the judgment, and Christian cross-appealed.

III. ASSIGNMENTS OF ERROR
B4 assigns, consolidated and restated, that the district court erred in (1) overruling its motion to dismiss and a motion for directed verdict under the doctrine of forum non conveniens, (2) applying Nebraska law rather than Tennessee law, (3) finding that the statute of frauds did not bar the breach of contract action, (4) failing to submit to the jury an instruction regarding the statute of frauds, and (5) overruling its motion in limine concerning Smith's payment of Christian's attorney fees in Christian's litigation with CNBW.
On cross-appeal, Christian assigns that the district court erred in (1) not ruling as a matter of law that the damages in this case were set by the $168,000-plus-interest judgment against Christian in prior litigation with CNBW and (2) not finding Smith, individually, jointly liable with B4 for the breach of contract.

IV. STANDARD OF REVIEW
Whether a suit should be entertained or dismissed under the rule of forum non conveniens depends largely upon the facts of the particular case and rests in the discretion of the trial court.[1]
When there are no factual disputes regarding state contacts, conflict-of-law issues present questions of law.[2] When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusion.[3]
Proceedings seeking disregard of corporate entity, that is, piercing the corporate veil to impose liability on a shareholder for a corporation's debt or other obligation, are equitable actions.[4] In an appeal of an *457 equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court.[5]
Concerning the overruling of a motion for a directed verdict made at the close of all the evidence, appellate review is controlled by the rule that a directed verdict is proper only when reasonable minds can draw but one conclusion from the evidence, where an issue should be decided as a matter of law.[6]
A civil jury verdict will not be disturbed on appeal unless clearly wrong.[7] Where the amount of damages allowed by a jury is clearly inadequate under the evidence, it is error for the trial court to refuse to set the verdict aside.[8]

V. ANALYSIS

1. FORUM NON CONVENIENS
B4 first argues that the district court erred when it overruled B4's pretrial motion to dismiss and motion for directed verdict under the doctrine of forum non conveniens. B4 contends that Tennessee provided a better and more appropriate forum for the action to be heard.
The doctrine of forum non conveniens refers to the discretionary power of a court to decline jurisdiction when the convenience of the parties and the ends of justice would be better served if the action were brought and tried in another forum.[9] Whether a suit should be entertained or dismissed under the rule of forum non conveniens depends largely upon the facts of the particular case.[10] Unless the balance is strongly in favor of the defendant, however, the plaintiff's choice of forum should rarely be disturbed.[11] The doctrine of forum non conveniens provides that a state will not exercise jurisdiction if it is a seriously inconvenient forum for the trial of the action, provided that a more appropriate forum is provided to the plaintiff.[12]
In this case, Christian chose to file this action in Cuming County, Nebraska. B4 failed to challenge the purportedly inconvenient forum until the day before trial. We have held that a forum is seriously inconvenient only if one party would be effectively deprived of a meaningful day in court.[13] And the trial court should consider practical factors that make trial of the case easy, expeditious, and inexpensive, such as the relative ease of access to sources of proof, the cost of obtaining attendance of witnesses, and the ability to secure attendance of witnesses through compulsory process.[14] Here, B4 was not effectively deprived of a meaningful day in court because, as the district court noted, on the day of the trial, all the parties and a *458 number of witnesses were already present and prepared for trial in Nebraska. Stated another way, by the time B4 made its objection. Nebraska was the only convenient forum in which to proceed. We determine that the district court did not abuse its discretion in denying B4's motion to dismiss under the doctrine of forum non conveniens.

2. CHOICE OF LAW
We next consider which state's law governs the issues at hand: Nebraska's or Tennessee's. B4 argues that the district court erred in overruling a pretrial motion to dismiss regarding choice of law and asserts that Tennessee law rather than Nebraska law should have applied. Specifically, B4 contends that the district court should have decided the case under the Tennessee statute of frauds. We disagree. We first note that because choice-of-law principles are not a bar to jurisdiction,[15] the applicability of Tennessee law would not support B4's motion to dismiss in any event. But because B4 also argues that Tennessee law should have been applied by the Nebraska court, we consider its choice-of-law argument.
The first step in a conflict-of-law analysis is to determine whether there is an actual conflict between the legal rules of different states.[16] Before entangling itself in messy issues of conflict of laws, a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.[17] In this case, we find no difference in the relevant law of the two states, and we therefore conclude that the district court did not err by applying Nebraska law.
First, the two statutes of frauds are virtually identical. Nebraska's statute of frauds provides in pertinent part as follows: "In the following cases every agreement shall be void, unless such agreement, or some note or memorandum thereof, be in writing, and subscribed by the party to be charged therewith: ... (2) every special promise to answer for the debt, default, or misdoings of another person."[18] Tennessee's statute of frauds provides in pertinent part, "No action shall be brought... [t]o charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person... unless the promise or agreement ... or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith."[19]
But, more important, both Tennessee[20] and Nebraska[21] recognize the common-law "leading object rule" exception to the statute of frauds. As will be discussed further below, it is this exception that determines the statute of frauds issue alleged by B4. And we can find no meaningful difference between the leading object rule in the two states. Because there is no meaningful conflict between the relevant principles of Nebraska and Tennessee law, we find no merit to B4's assignment of error.

3. STATUTE OF FRAUDS
B4 argues that the district court erred in finding that the statute of frauds *459 did not bar the breach of contract claim and in failing to submit any statute of frauds instruction to the jury. B4 specifically claims that even assuming the alleged oral contract was an agreement by B4 to pay for Christian's debt, it would be unenforceable because it was not in writing. Under the undisputed facts of this case, we determine, for the reasons set forth below, that the statute of frauds would not apply and that, as a result, the district court did not err in failing to instruct the jury on the issue.
While instructions withdrawing consideration of material issues of fact presented by the pleadings and evidence are erroneous, the trial court must eliminate all matters not in dispute and submit only the controverted questions of fact on which the verdict must depend.[22] Here, the district court properly found that the benefit to B4 was so plainly apparent from the evidence adduced at trial that the alleged oral promise would be outside the statute of frauds under the leading object rule. As a result, the district court correctly withheld a statute of frauds instruction.
As mentioned above, Nebraska's statute of frauds provides that "every special promise to answer for the debt, default, or misdoings of another person" "shall be void, unless such agreement, or some note or memorandum thereof, be in writing, and subscribed by the party to be charged therewith."[23] Nevertheless, under the leading object rule, a promise to answer for the debt of another will be valid, although not in writing, when the principal object of the party promising to pay the debt is to promote his own interestsand not to become a guarantor or suretyand when the promise is made on sufficient consideration.[24] Under this "leading object exception" to the statute of frauds, the consideration to support an oral promise to pay the debt of another must operate to the advantage of the promisor. It also must place him under a pecuniary obligation to the promisee independent of the original debt, which obligation is to be discharged by the payment of that debt.[25]
The Restatement (Second) of Contracts[26] explains that when the leading object of the promise is to promote the promisor's own interests, then the promisor does not need the protection against his own generous impulses afforded by the statute of frauds. Where the promisor's main objective is to serve his own pecuniary or business advantage, the gratuitous element of the suretyship is eliminated, the likelihood of disproportion in the values exchanged is reduced, and the context of commercial dealings provides its own evidentiary safeguards.[27]
For the "leading object" of the promise to be the promisor's own interests, the promisor need not receive cash in hand from the promise. Nevertheless, the path of benefits flowing to the promisor must not be so circuitous or uncertain that obtaining those benefits cannot be said to have been his main purpose in making the *460 promise.[28] As a matter of practicality, the promisor's advantage must be served in a straightforward way in order for the main purpose rule to apply.[29] We treat the terms "leading object" and "main purpose" synonymously.
Here, the evidence establishes that Smith, or Smith on behalf of B4, intended by his agreement with Christian to procure an immediate and substantial benefit flowing directly to himself or B4. The immediate and substantial benefit Smith intended was the ownership of the cattle and the potential profits from the sale of the cattle. Smith admitted at trial that it was he, and not Christian, who actually owned the cattle purchased with the line of credit. And in his deposition, Smith admitted, albeit reluctantly, that he was to receive any profits from the sale of the cattle that were purchased with the CNBW funds. This was consistent with the other testimony presented at trial and was not contradicted by any of the evidence presented. Christian testified that under the oral agreement, "it was defined to me that [Smith] got all profits and all losses and all I got was the commission per load." And Kant, the feedlot owner, testified that he understood that the cattle belonged to Smith, and Kant actually sent Smith all profits from the sale of cattle.
Thus, the evidence establishes that the main purpose of any oral promise by Smith, or Smith on behalf of B4, to pay Christian's debt was to serve his own interests. Smith's principal object in agreeing to the deal was to garner profits from the sale of fattened cattleand not to become Christian's guarantor. The oral agreement, therefore, falls within the ambit of the leading object rule, and the agreement need not be in writing to be enforceable. Because the benefit to Smith or B4 was so plainly apparent from the record and therefore outside the statute of frauds, the district court correctly withheld a statute of frauds instruction. Because the evidence was insufficient as a matter of law to support a finding that Christian's claim was barred by the statute of frauds, we find no merit to B4's third or fourth assignments of error.

4. MOTION IN LIMINE
Finally, B4 argues that the district court erred in admitting evidence of Smith's offer to pay the attorney fees Christian incurred in the CNBW litigation. At trial, Smith testified that he offered to help Christian fight the CNBW suit and find him an attorney. Christian testified, over the objection of B4's counsel, that Smith told him he would help get Christian an attorney and would help pay for the litigation. B4 asserts that the evidence regarding the attorney fees was irrelevant and prejudicial.
But the only objection B4 made at trial was based on foundation and the form of the question. A motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of such a motion to obtain a final ruling upon the ultimate admissibility of the evidence.[30] And because overruling a motion in limine is not a final ruling on the admissibility of evidence and does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate *461 objection or offer of proof during trial.[31]
B4's brief does not direct us to any objection made to the disputed testimony at trial that was based on relevance, nor can we find such in the record. It is well established that a litigant must specify the grounds for an objection at trial to preserve the issue for appeal.[32] An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground.[33] Because B4 did not preserve its arguments with respect to relevance or unfair prejudice by objecting on those grounds at trial, we do not consider its assignment of error to that effect.

5. CROSS-APPEAL

(a) Smith's Individual Liability
On cross-appeal, Christian contends that the district court erred when it ruled as a matter of law that only B4 was liable.
Christian pled his case as a claim against Smith and B4. The complaint alleges that
Bert Smith IV and B4 Cattle Company wanted to increase the number of cattle they had on feed in Nebraska. Bert Smith IV, in his personal capacity, asked his life long friend, Chris Christian, to enable him to do this by way of the following oral agreement:
. . . .
(d) The equity in the cattle would be owned by Bert Smith IV and B4 Cattle Company. All profits would go to Bert Smith IV and B4 Cattle Company.
(e) Bert Smith IV and B4 Cattle Company would hold [Christian] harmless on any loss.
(f) Bert Smith IV and B4 Cattle Company would pay [Christian] a commission....
In their answer, Smith and B4 "[affirmatively alleges [sic] that the Defendant, Bert Smith IV, is not a proper party to this action as said Defendant B4 Cattle Company, Inc. is a separate and distinct entity free of the Defendant, BERT SMITH IV, which followed corporate formalities and had no dealings with [Christian]."
Christian had only one oral agreement, and it was with either Smith or B4. The only way both Smith and B4 could be liable would be if B4 was found to be liable and the corporate veil was pierced to make Smith also liable. The pleadings and the evidence adduced do not indicate in any way that Smith and B4 could be jointly liable without piercing the corporate veil. It is obvious from the record that the only issue before the district court as to Smith's individual liability was whether Christian had proved a piercing of the corporate veil of B4.
In granting Christian's motion for a directed verdict as to Smith, the district court reasoned that because Christian failed to present sufficient evidence to pierce the corporate veil, only B4 should be submitted to the jury as a defendant. Proceedings seeking disregard of corporate entity, that is, piercing the corporate veil to impose liability on a shareholder for a corporation's debt or other obligation, are equitable actions.[34] In an appeal of an *462 equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court.[35] We agree with the district court that Christian failed to present sufficient evidence to pierce the corporate veil.
Generally, a corporation is viewed as a complete and separate entity from its shareholders and officers, who are not, as a rule, liable for the debts and obligations of the corporation.[36] A court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another.[37] A corporation's identity as a separate legal entity will be preserved, as a general rule, until sufficient reason to the contrary appears.[38]
A plaintiff seeking to pierce the corporate veil must allege and prove that the corporation was under the actual control of the shareholder and that the shareholder exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights.[39] A plaintiff seeking to impose liability for a corporate debt on a shareholder has the burden to show by a preponderance of the evidence that the corporate identity must be disregarded to prevent fraud or injustice to the plaintiff.[40]
Some of the relevant factors in determining whether to disregard the corporate entity on the basis of fraud are (1) grossly inadequate capitalization, (2) insolvency of the debtor corporation at the time the debt is incurred, (3) diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, and (4) the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.[41]
The first element of the test, inadequate capitalization, means capitalization very small in relation to the nature of the business of the corporation and the risks entailed.[42] Inadequate capitalization is measured at the time of incorporation.[43] A corporation which was adequately capitalized when formed but which has suffered losses is not necessarily undercapitalized.[44] Undercapitalization presents a question of fact that turns on the nature of the business of the particular corporation.[45] In the case at hand, the record does not establish any evidence regarding undercapitalization at the time of incorporation.
*463 The second factor used to determine whether a corporation's identity should be disregarded is whether the corporation was insolvent at the time the debt was incurred.[46] A corporation is insolvent if it is unable to pay its debts as they become due in the usual course of its business, or if it has an excess of liabilities of the corporation over its assets at a fair valuation.[47] Whether a corporation is insolvent is usually a question of fact.[48] In this case, the record does not contain any evidence indicating that B4 was insolvent.
The third factor of the test to determine whether the corporate veil should be pierced is evidence of a diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses. When a principal shareholder appropriates and uses corporate funds and property for his personal purposes and thereby defrauds and causes damages to creditors, the shareholder can be held individually liable for corporate debt.[49] There was no evidence adduced at trial to show that Smith diverted funds from B4 for his personal purposes.
We turn now to the fourth prong of the test. If the corporation is a facade for the personal dealings of the shareholder and the operations of the corporation are carried on by the shareholder in disregard of the corporate entity, the shareholder may be individually liable for corporate debt.[50] The separate entity concept of the corporation may be disregarded where the corporation is a mere shell, serving no legitimate business purpose, and is used as an intermediary to perpetuate fraud on the creditors.[51] In this case, Smith testified that he is the sole shareholder, officer, and member of the board of directors of B4. But this, in itself, is insufficient to show that B4 was a mere shell to perpetrate fraud.
We conclude that Christian presented insufficient evidence at trial to show that B4's corporate entity should be disregarded. Therefore, we find no merit to Christian's assignment of error.

(b) Damages
We next turn to the issue of damages. Christian claims that the district court erred in not ruling as a matter of law that the damages were set by the $168,000-plus-interest judgment against Christian in prior litigation with CNBW. We agree.
Where the amount of damages allowed by a jury is clearly inadequate under the evidence, it is error for the trial court to refuse to set the verdict aside.[52] In this case, the uncontroverted evidence established that the damages Christian suffered as a result of the breach of the oral agreement were equal to the CNBW judgment of $168,000 plus interest at 16 percent. Evidence on damages was not in dispute. The jury, however, awarded only $130,000 to Christian. As a result, we conclude as a matter of law that the verdict should be in the sum of $168,000 plus interest at 16 percent from January 5, 2006.

*464 VI. CONCLUSION
For each of the above reasons, we affirm as modified.
AFFIRMED AS MODIFIED.
NOTES
[1] Woodmen of the World Life Ins. Soc. v. Kight, 246 Neb. 619, 522 N.W.2d 155 (1994).
[2] Heinze v. Heinze, 274 Neb. 595, 742 N.W.2d 465 (2007).
[3] Nebraska Coalition for Ed. Equity v. Heineman, 273 Neb. 531, 731 N.W.2d 164 (2007).
[4] J.L. Brock Bldrs., Inc. v. Dahlbeck, 223 Neb. 493, 391 N.W.2d 110 (1986).
[5] Reed v. Reed, 275 Neb. 418, 747 N.W.2d 18 (2008).
[6] Frank v. Lockwood, 275 Neb. 735, 749 N.W.2d 443 (2008).
[7] Nebraska Nutrients v. Shepherd, 261 Neb. 723, 626 N.W.2d 472 (2001).
[8] Springer v. Bohling, 263 Neb. 802, 643 N.W.2d 386 (2002).
[9] Ameritas Invest. Corp. v. McKinney, 269 Neb. 564, 694 N.W.2d 191 (2005).
[10] Woodmen of the World Life Ins. Soc. v. Kight, supra note 1.
[11] Ameritas Invest. Corp. v. McKinney, supra note 9.
[12] Id.
[13] Polk Cty. Rec. Assn. v. Susquehanna Patriot Leasing, 273 Neb. 1026, 734 N.W.2d 750 (2007).
[14] Ameritas Invest. Corp. v. McKinney, supra note 9.
[15] See Johnson v. Johnson, 272 Neb. 263, 720 N.W.2d 20 (2006).
[16] Heinze v. Heinze, supra note 2.
[17] Malena v. Marriott International, 264 Neb. 759, 651 N.W.2d 850 (2002).
[18] Neb.Rev.Stat. § 36-202 (Reissue 2004).
[19] Tenn.Code Ann. § 29-2-101 (Supp. 2008).
[20] See Wolff Ardis, P.C. v. Kimball Products, Inc., 289 F.Supp.2d 937 (W.D.Tenn.2003).
[21] See, In re Estate of Dueck, 274 Neb. 89, 736 N.W.2d 720 (2007); Fitzgerald v. Morrissey, 14 Neb. 198, 15 N.W. 233 (1883).
[22] Palmtag v. Gartner Constr. Co., 245 Neb. 405, 513 N.W.2d 495 (1994).
[23] § 36-202.
[24] In re Estate of Dueck, supra note 21: Fitzgerald v. Morrissey, supra note 21; 4 Caroline N. Brown, Corbin on Contracts § 16.1 (Joseph M. Perillo ed., rev. ed. 1997).
[25] Heese Produce Co. v. Lueders, 233 Neb. 12, 443 N.W.2d 278 (1989). See, also, VSC, Inc. v. Lilja, 203 Neb. 844, 280 N.W.2d 901 (1979).
[26] Restatement (Second) of Contracts § 116 (1981).
[27] Id.
[28] Graybar Elec. Co. v. Sawyer, 485 A.2d 1384 (Me.1985) (citing Restatement, supra note 26).
[29] Id.
[30] See State v. Timmens, 263 Neb. 622, 641 N.W.2d 383 (2002).
[31] See id.
[32] Blue Valley Co-op. v. National Farmers Org., 257 Neb. 751, 600 N.W.2d 786 (1999).
[33] State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006).
[34] J.L. Brock Bldrs., Inc. v. Dahlbeck, supra note 4.
[35] Reed v. Reed, supra note 5.
[36] Baye v. Airlite Plastics Co., 260 Neb. 385, 618 N.W.2d 145 (2000).
[37] Global Credit Servs. v. AMISUB, 244 Neb. 681, 508 N.W.2d 836 (1993).
[38] Southern Lumber & Coal v. M.P. Olson Real Estate and Construction Co., 229 Neb. 249, 426 N.W.2d 504 (1988).
[39] Baye v. Airlite Plastics Co., supra note 36; Wolf v. Walt, 247 Neb. 858, 530 N.W.2d 890 (1995).
[40] Southern Lumber & Coal v. M.P. Olson Real Est., supra note 38.
[41] Wolf v. Walt, supra note 39.
[42] Id.
[43] Id.
[44] Southern Lumber & Coal v. M.P. Olson Real Est., supra note 38.
[45] Id.
[46] Wolf v. Walt, supra note 39.
[47] Id.
[48] J.L. Brock Bldrs., Inc. v. Dahlbeck, supra note 4.
[49] See Scribner Grain & Lumber Co. v. Wortman, 204 Neb. 92, 281 N.W.2d 394 (1979).
[50] Wolf v. Walt, supra note 39. See J.L. Brock Bldrs., Inc. v. Dahlbeck, supra note 4.
[51] Carpenter Paper Co. v. Lakin Meat Processors, 231 Neb. 93, 435 N.W.2d 179 (1989).
[52] Springer v. Bohling, supra note 8.