IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


PERKINS V. RMR BUILDING GROUP


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


PERKINS, L.L.C., ET AL., APPELLANTS,

V.

RMR BUILDING GROUP, LLC, AND ROBERT M. RYAN II, APPELLEES.


Filed April 1, 2025.    No. A-23-947.


Appeal from the District Court for Douglas County: JEFFREY J. LUX, Judge. Reversed and remanded with directions.

Steven G. Ranum and Josiah J. Shanks, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, L.L.C., and Robert F. Bartle, of Bartle & Geier, for appellants.

Michael J. Mullen for appellees.


PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Michael Perkins is the sole owner of Perkins, L.L.C., and MHP Development, LLC, both of which are Nebraska limited liability companies. He also owns Perkins Properties, Inc., a Nebraska corporation. We will refer to Perkins and his business entities individually and collectively as "Perkins." Robert M. Ryan II is the owner and sole member of RMR Building Group, LLC (RMR), a Nebraska limited liability company. Perkins hired RMR to work on a commercial construction project in Omaha, Nebraska. A dispute arose when RMR failed to pay one of its subcontractors, Xtreme Heating and Cooling, LLC (Xtreme), for HVAC units, even though Perkins paid RMR's invoice that included Xtreme's charges for those units. Perkins filed suit against RMR and Ryan for breach of contract, money had and received, unjust enrichment, conversion, fraudulent inducement, and "Piercing Corporate Veil"; Perkins sought a judgment

- 1 -

against both defendants, jointly and severally. Following a bench trial, the Douglas County District Court entered a judgment against RMR for $549,916.58, plus prejudgment interest and costs. The district court declined to hold Ryan personally liable. Perkins appeals.

Because the evidence supports piercing the limited liability company's veil, we reverse and remand the case to the district court with directions to enter its judgment in favor of Perkins against RMR and Ryan jointly and severally.

## II. BACKGROUND

### 1. FACTS LEADING TO LAWSUIT

Perkins, "[p]rimarily a developer," who has worked in real estate for approximately 50 years, hired RMR to work on a shopping center construction project in Omaha. The parties entered into a cost-plus arrangement, in which RMR agreed to complete the project for its costs plus an overhead and profit charge of 4.5 percent. Under the arrangement, RMR sent Perkins invoices for the project's costs and added the 4.5 percent overhead and profit charge. Upon Perkins paying the invoice, RMR was responsible for paying its subcontractors and suppliers. A written contract, dated June 7, 2021, was prepared for the first phase of construction, and a later written "Prime Contract Change Order #001," dated August 13, 2021, was prepared for "Phase 2." The change order reflected the "original" contract sum of $3,026,005. With the change order amount of $2,324,660, the new "contract sum" was $5,350,665. David Critser, RMR's vice president of construction, was identified as the "Contractor's representative" in the initial contract, as well as on the signature line for RMR. The parties did not produce a signed version of either contract, but they did not dispute the basic terms of their agreement and unsigned copies of the documents were received at trial.

On January 21, 2022, during the second phase of construction, RMR submitted two invoices to Perkins: one for $669,757.08 and another for $39,876.08. The itemization contained in the $669,757.08 invoice reflected a charge of $526,236 for "HVAC Equipment-Xtreme HVAC Invoice 2173," dated December 27, 2021. On that date, Xtreme had sent RMR an invoice for $526,236, a copy of which was provided to Perkins. The charge was for HVAC units needed for the construction project and Xtreme would not release the HVAC units until payment was made. Perkins wrote RMR a check for $709,633.16 on February 17, 2022, satisfying both invoices. Perkins' check was deposited by RMR into its general operating bank account on February 22.

Perkins learned from Critser that "[s]hortly after [Perkins] made the payment on the check to RMR" that the Xtreme invoice was not paid. Perkins "immediately" contacted an attorney, who then sent a letter to RMR (addressed to Ryan) on March 10, 2022. That letter indicated that it had come to their attention that Xtreme's $526,236 invoice had not been paid by RMR and that "RMR may have used the funds paid by [Perkins] to pay expenses unrelated to the above referenced project." Perkins demanded proof of payment to Xtreme and a construction lien waiver or, in the alternative, reimbursement of amounts paid by Perkins on the invoice. By the middle of March, Perkins had his "doubts" that RMR was going to finish the project and pay Xtreme "[b]ecause nobody had responded to any of the communication that . . . counsel had sent out," and Perkins had left several messages and voicemails for which he received no response. On March 25, another letter was sent from Perkins' attorney to RMR indicating they had received no response to the previous letter and noting that the Xtreme invoice remained unpaid. The letter also stated that

- 2 -

Perkins was aware that RMR "has abandoned work on the Projects" and "has no intent or ability to complete the Projects." As a result, Perkins terminated the contracts and directed RMR to cease work on the projects and to not enter job sites.

This left Perkins "hanging," so he "assessed the situation" and "decided to continue on with the people who had been working on the job and continue with where it was at and form a construction company." And because he was "under a time guideline" to finish the project, Perkins was "forced" to form a construction company in March 2022 called Perkins & Critser Construction, LLC (Perkins & Critser). Perkins owned 90 percent of the company and Critser owned 10 percent. On May 17, 2022, Perkins issued a check to Perkins & Critser for $526,236, who then paid the Xtreme invoice from December 27, 2021, to obtain the HVAC units necessary to move forward with the project. As a result, Perkins effectively paid the same invoice twice: once when paying the RMR invoice and again when Perkins & Critser took over the project.

## 2. PLEADINGS

Perkins filed a complaint against RMR and Ryan on April 29, 2022, alleging breach of contract, money had and received, unjust enrichment, conversion, fraudulent inducement, and "Piercing Corporate Veil." Perkins sought to hold Ryan jointly and severally liable with RMR. Perkins filed a motion for default judgment on July 5, requesting the district court to enter a judgment against RMR on the grounds that RMR failed to answer the complaint in a timely manner. RMR filed an answer and counterclaim on August 8, and the court subsequently granted RMR leave to file its answer out of time. RMR's counterclaim was dismissed without prejudice on August 22.

## 3. TRIAL

Trial took place on September 18, 2023. In addition to the facts set forth above, the evidence at trial revealed the following.

Perkins testified that in his 50 years of experience in the real estate industry, he had worked extensively with contractors, many of whom he hired under a cost-plus arrangement. Perkins explained that when he pays a contractor on a cost-plus basis, he expects the contractor to use those funds to pay the subcontractors and suppliers who are owed money on the project. He "assumed every sub on there and every expense was going to be paid," and that is "normal in the industry." Perkins put his "[c]omplete trust" in RMR to handle his funds in this manner and he never gave RMR or Ryan permission to use his funds to pay creditors on other projects.

Critser, RMR's former "vice president/director of construction," testified that he had around 30 years of experience in the construction industry. He was introduced to Ryan by a mutual friend and Ryan was "building a building" next to another construction office where Critser was working at the time. Ryan told Critser that "he might need some help consulting . . . on the building," so Critser started "helping him out." They "just built a relationship from there and . . . started RMR Building Group -- or [Ryan] started RMR Building Group, and [Critser] went to work for him that year." He worked at RMR from September 2019 to March 2022 and earned a weekly salary of $2,000. At the "very beginning of RMR," Ryan had already been working on a building involving Lisa and DJ Rezac (the Rezacs) and Ryan "got . . . upside down on the project." It was during that time Critser was introduced to Ryan to "try to help him out" and "then we partnered

- 3 -

up." That project "was going on . . . the very beginning of RMR," Ryan was "over budget," and the Rezacs were "sticking it to him as far as paying the bills." According to Critser, "[A]ll that stuff was coming out of RMR's pocket, even though it wasn't an RMR Building Group project." He added, "So obviously being a young group, we were struggling financially from the beginning, especially when you're paying for a job that wasn't part of the building group." Critser talked to the Rezacs about loaning the money to Ryan and RMR. "There was a promissory note" to "help us out," but the Rezacs did not trust Ryan would pay them back, so they required both Ryan and Critser to personally guarantee the loan. Critser agreed to it because he was "[t]rying to help the company out." He explained that "it's tough to start a company" and there were financial issues, so Critser "signed on" so the company "wasn't shut down right away with paying out-of-pocket costs that it didn't have."

Critser was involved in drafting the contract with Perkins for the shopping center project; the work was to be done on a cost-plus basis. Based on Critser's understanding, once Perkins paid RMR's invoices, RMR was responsible for paying its subcontractors and suppliers, as well as obtaining lien waivers.

Regarding the January 1, 2022, invoice sent by RMR to Perkins, Critser said his "only role" was to "put together the list" and get it over to the accountant and bookkeeping for payment. When Critser was asked if he played a role in deciding not to pay the Xtreme invoice, he responded, "No. I questioned it, actually, multiple times, of why it wasn't paid." According to Critser, Ryan and the accountant told him that "they were waiting for funds" to transfer from one bank to another bank to "finish paying out the invoices." Critser testified that it was "[i]rresponsible" how RMR handled its customers' funds. He stated that once a customer's funds came in, Ryan, with the help of RMR's accountant, made decisions as to which RMR creditors to pay, and they did not always pay the creditors for the customer's specific project. As a result, "[t]here [were] subs and vendors that [he would] constantly hear from that weren't paid . . . and they'd have to be begging to get payment." Critser stated that he repeatedly expressed his concerns about mishandling customer funds to Ryan and the accountant. He specifically brought up his concerns about RMR's use of the funds provided by Perkins, to which Ryan would reply, "I'm working on it."

Critser realized around the first or second week of March 2022 that the Xtreme invoice was not going to get paid because "prior to this whole deal, I had been told that there was only a few weeks of payroll left for the company," and "then just the dragging out of this hasn't been paid. I don't . . . know where he can just . . . make up $500,000 to pay the vendor." Critser claimed that "ever since fall of 2019 when we started, it was brought up multiple times to . . . both [the accountant] and [Ryan] about how these invoices were supposed to be handled on a cost-plus basis." "[T]he overhead and profit is really a small portion of the invoice is what RMR was entitled to. Everything else was vendors, that you have to pay them based on what you're getting paid for." There were arguments and Critser was told that he "didn't know what [he was] talking about."

Critser also testified that RMR had covered expenses beyond a project's direct costs, including $7,500 for a concrete patio at Ryan's house. He stated that costs such as these take "a lot of work to make up."

Finally, Critser acknowledged preparing the RMR invoice that included the December 27, 2021, Xtreme invoice. Further, he delivered the RMR invoice to Perkins, endorsed Perkins' check

for the invoice, and deposited it into RMR's operating account. He acknowledged that he had check-writing authority for RMR's operating account.

RMR's accountant admitted that the Xtreme invoice had not been paid by RMR. He testified that at the time RMR deposited Perkins' check, RMR had "quite a few" creditors besides Xtreme seeking payment. The accountant explained that "[t]he only thing [he] did in accounts payable was write checks when [he] was told to," and either Ryan or Critser told him who to pay. The following colloquy occurred between Perkins' counsel and the accountant:

> [Counsel]: Okay. I want to run you through a hypothetical scenario, if you would indulge me here. So let's say I am a customer of RMR. RMR then sends me an invoice, and then I pay. . . . So who would take the check that I wrote and deposit it?
>
> [Accountant]: Sometimes I did. Sometimes [Ryan] did. Sometimes [Critser] did.
>
> [Counsel]: And then how would subcontractors and suppliers subsequently be paid on my project?
>
> [Accountant]: A list was made up of who to pay, of what subcontractors. Then it was given to me, and I write -- write the checks and gave them to [Ryan] to sign.
>
> . . . .
>
> [Counsel]: How soon after my check was deposited would subcontractors on my project get paid?
>
> [Accountant]: Within a few days.
>
> [Counsel]: Did [Ryan] ultimately make the call on which subs and suppliers to pay?
>
> [Accountant]: No. That decision was pretty much made based upon what [Critser] said because he was the one that was most familiar with the percent of completion of the jobs or, you know, what subcontractors needed to be paid.
>
> [Counsel]: And are you speaking about the general -- that generally that was the practice at RMR?
>
> [Accountant]: Yes.
>
> [Counsel]: Okay. Would you say that [Ryan] though ultimately made the call on who to pay?
>
> [Accountant]: Well, ultimately, if [Ryan] was signing the checks, I suppose he could possibly change something. But it wasn't too often that that was done, if it was done at all.
>
> . . . .
>
> [Counsel]: What if there was a problem as far as paying subs and suppliers? Who would make the call as to who should be paid?
>
> [Accountant]: Probably [Ryan].

When asked whether it was accurate to say that Critser had the "power to suggest who to pay," the accountant responded:

> Well, it was more than suggest. He made up the list. [Ryan] and I were incapable of making up a list because we weren't familiar with the jobs . . . . [Critser] would [have been] familiar with that, so we relied on [him] to make those decisions. . . . [H]is ability to decide who to pay was more than just a suggestion; it was an outright decision.

Theodore J. Pelster, a construction company owner, testified that he had worked as a general contractor for 40 years. He had a Class B commercial license and primarily handled commercial construction projects. His company's projects included restaurants, banks, gas stations, and warehouses. Pelster explained a cost-plus arrangement as providing the customer on a monthly basis "all the bills that need to be paid." "Our . . . suppliers and subcontractors usually bill us around the 25th of the month. We will present that bill on a list to the owner, including our fees." The list is called a "pay application," which is an invoice that includes the underlying invoices. By submitting a pay application to the customer, it is "telling them that I'm going to pay all those invoices . . . [o]nce I get paid." Upon getting the payment, the subcontractors and suppliers are then paid "by around the 15th of the following month." According to Pelster, the funds are not used to pay "non-project-related creditors." The funds "need to go to the people on that list." In Pelster's opinion, it was "misappropriation" to use a customer's payment to pay "non-project-related creditors."

Ryan testified that RMR's corporate status is "closed," it last had employees in October 2022, and it had no assets. He said that RMR had bank accounts at two different banks, one bank was used for RMR's "general operating account," and the other bank was used for a "payroll account and some lines of credit" (payroll bank). The payroll bank also had "operating" accounts for two other projects. Ryan and the accountant had "signature authority" at the payroll bank; Ryan and Critser had authority over the general operating account at the other bank. The subcontractor invoices were paid from RMR's "main operating account." Money would be transferred from the operating account to fund the payroll account; RMR did "weekly payroll."

Ryan testified that Critser prepared the invoices sent out to customers. He said there were weekly meetings with Critser about "what was going out and what would be coming in and, you know, kind of overall cash flow." Ryan acknowledged that he knew when Perkins was being invoiced for the Xtreme charges. He also admitted that the Xtreme invoice was paid by Perkins, and the check covering that payment was deposited into RMR's operating account. He also admitted that RMR did not pay the Xtreme invoice even though Perkins had paid the invoice. Ryan acknowledged that with the funds received from Perkins, he "paid creditors not necessarily specific to the Perkins job." Ryan said he paid "[p]ayroll, phone allowances, yeah, general operating expenses." When asked, "Would it be accurate that the subs and suppliers that were getting paid were whoever was causing the most problems at that particular time," Ryan responded, "That would be correct." When asked if it was Critser "who made the call not to pay . . . the invoice to Xtreme," Ryan replied, "No." Ryan acknowledged that it was his call, "By default, yes."

Ryan acknowledged that the Perkins check had been deposited on February 22, 2022. He was then asked about checks written out of RMR's operating account after that point. In reviewing copies of checks contained in exhibit 15, Ryan acknowledged the following payments: $7,500 on March 3 to an individual "for his work on a lawsuit" involving Ryan as a co-defendant (we note that exhibit 16 reflects another payment of $5,000 to the same person on October 17); $17,371 on February 25 to Xtreme, but Ryan was not sure what it was for; $4,247 on February 28 to RMR/Mercury I-80 LLC for rent; $24,261.51 on February 28 and $1,559.07 on February 23 to Ryan's "sister-in-law" (one of the Rezacs) for "full payoff" of a promissory note on which both Ryan and Critser were personal guarantors on the loan; $352,000 on February 25 to Xtreme, but this payment was for a different project that Ryan could not recall.

Regarding exhibit 16, Ryan acknowledged the following payments from RMR's operating account that were deposited into RMR's payroll account in 2022; the date and Ryan's explanations are also provided: $13,565.03 (February 23, payroll); $11,179.91 (March 1, payroll); $72,500 (March 4, Ryan was "not sure" what that was for). Ryan was asked about two other projects that RMR was working on and whether those projects were "in trouble." He had loans for both those other projects at the payroll bank, so he was "not sure what [the $72,500] went to." Ryan said one of those projects had originated in March of 2020 and was supposed to be a 6-month project. But they had "two guys sitting down there for 16 months," and the other project had $330,000 in "unapproved change orders" allegedly made by Critser "on his way out the door to Perkins-Critser." Ryan said he was being sued by one of those other projects. When asked if the $72,500 could have been used to "cover a shortfall" with either of the other two projects, Ryan responded that one loan "wasn't called until . . . after this," so he was unable to provide any explanation.

There were also checks written on the payroll account for deposit into the operating account: $4,096.14 (March 10, 2022); $6,719.86 (March 22); and $4,856.85 (April 18). Ryan explained that he had a line of credit at the payroll bank, so "any time there was a shortfall," he could "borrow against that to fund operations."

Ryan confirmed that in early March of 2022, he had let a "few employees go" and that he was "hemorrhaging cash at that point." He agreed that by March 10, RMR was drawing on lines of credit to fund payroll. Ryan decided to "wind things up at RMR" in "early April."

Ryan shifted the blame to Critser. Ryan testified that he had no role in the construction-side of RMR and that he relied on Critser for that. He also relied on Critser for fielding and preparing invoices. He claimed that Critser would go 45 to 60 days without billing customers, which was beyond the industry standard of billing on the 25th of each month, as discussed by Pelster. Ryan had "weekly" discussions with Critser about these concerns.

Ryan testified that Critser was also in charge of hiring RMR's employees but that he hired more than RMR could afford. Payroll went over $15,000 a week even though it was never RMR's intention to exceed that amount. Ryan stated:

I blame myself for -- for trusting [Critser] that, hey, we need this guy; we need this guy to get more work, to be able to do -- do more. And I trusted him to -- you know, he's been at big companies before and seen structure, so I thought I'd go get more work and we'd make it happen.

At some point, Ryan applied for an increase in RMR's line of credit. The payroll bank agreed to the increase "in principle," subject to RMR providing certain documentation. According to Ryan, he informed the bank that RMR had "$9 million with Perkins," prompting the bank to request signed contracts. Ryan testified that Critser was unable to provide any signed contracts with Perkins, and therefore, "not only did [the payroll bank] pull [RMR's] $150,000 line, they denied the increase to [$]400,000." As a result, RMR was unable to pay the Xtreme invoice. Ryan stated, "After the credit line got denied, there was really no way out."

Ryan testified that he did not intend to "stiff" Xtreme and that it was RMR's intention to pay all creditors. However, RMR did not have the financial ability to do so.

On October 30, 2023, the district court entered a judgment in favor of Perkins and against RMR in the amount of $549,916.58, plus prejudgment interest and costs. However, the court did not hold Ryan jointly and severally liable with RMR.

### (a) Piercing Corporate Veil

The district court initially found that Ryan's "election to use Perkins' funds for other RMR purposes, while in contravention of industry standards regarding a cost[-]plus arrangement, was nothing more than a prioritization to pay other RMR obligations." The court went on to say that it

> was not persuaded that Ryan's handling of RMR funds met the relevant factors to disregard the corporate entity. There was no evidence that RMR was grossly undercapitalized at the time it was formed or insolvent at the time the debt was incurred. Additionally, there was no evidence that RMR was a mere façade for Ryan's personal dealings.

The court further explained that there was not enough evidence to show that Ryan diverted the assets of RMR for an improper or personal use. It stated,

> There is no evidence Ryan absconded with any funds, whether funds of [Perkins] or anyone else. Additionally, the RMR salary drawn by Ryan was not an exorbitant salary, and was less than what RMR paid its project managers. There is no evidence any RMR funds were used to pay anything other than legitimate debts of RMR. This would include the payment of the promissory note to the Rezacs, and paying mortgage payments for RMR/Mercury I-80, LLC. [Perkins] characterized these particular bills as being paid because it was debt that was personally guaranteed by Ryan. In [*407 N 117 Street v. Harper*, 314 Neb. 843, 993 N.W.2d 462 (2023)], the Nebraska Supreme Court found similar choice of possibilities did not weigh in favor of veil piercing.

The court concluded that "Ryan should not be jointly and severally liable with RMR for the full amount of the judgment."

### (b) Torts of Fraud and Conversion

The district court also found that Ryan did not commit the torts of fraud and conversion. The court reasoned that the fraud allegation against Ryan "is directly tied to RMR's obligations that arose only because of RMR's agreement with [Perkins]." Additionally, the court stated that "Ryan did not partake in any actions to fraudulently induce [Perkins] into paying RMR." It explained that the evidence showed that Critser, not Ryan, prepared the RMR invoice that included the Xtreme invoice. Further, Critser delivered the RMR invoice to Perkins, endorsed Perkins' check for the invoice, and deposited it into RMR's operating account. The court found that "Ryan had no role in these actions," and "[e]ven if Critser acted with fraudulent intent, Ryan is not liable because Ryan was not personally connected to these actions."

Regarding the conversion claim, the district court held that Perkins failed to show that it had an "immediate right to the money that was allegedly converted." It stated, "To the contrary, the evidence reveals that [Xtreme] issued an invoice to RMR for payment. Pursuant to contractual obligations, RMR in turn submitted the Xtreme invoice to [Perkins]. At that point, pursuant to the

parties' arrangement, any money [Perkins] paid no longer belonged to [it]." The court further reasoned that Perkins failed to prove that Ryan possessed any of the funds because the money was deposited into RMR's "operating account and Ryan never had possession of the funds." It added, "All funds were then used to pay RMR obligations."

Perkins appeals.

## III. ASSIGNMENTS OF ERROR

Perkins assigns, restated, that the district court erred by (1) not piercing the corporate veil to hold Ryan jointly and severally liable with RMR and (2) determining that Ryan did not commit the torts of fraud and conversion.

## IV. STANDARD OF REVIEW

Proceedings seeking disregard of corporate entity, that is, piercing the corporate veil to impose liability on a shareholder for a corporation's debt or other obligation, are equitable actions. *Christian v. Smith*, 276 Neb. 867, 759 N.W.2d 447 (2008). In an appeal of an equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court. *Id.* Where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Tegra Corp. v. Boeshart*, 317 Neb. 100, 8 N.W.3d 786 (2024).

## V. ANALYSIS

Individual members and managers of a limited liability company are generally not liable for debts, obligations, or liabilities of the company, whether arising in contract, tort, or otherwise. See Neb. Rev. Stat. § 21-129 (Reissue 2022). See, also, *Thomas & Thomas Court Reporters v. Switzer*, 283 Neb. 19, 27, 810 N.W.2d 677, 685 (2012) (addressing piercing "company veil" and citing legal principles from *Christian v. Smith, supra*, which involved piercing corporate veil). A court will disregard such a company's identity only where the company has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. *Thomas & Thomas Court Reporters v. Switzer, supra.* The company's identity as a separate legal entity will be preserved, as a general rule, until sufficient reason to the contrary appears. *Id.* And a plaintiff seeking to impose liability on an individual member or manager has the burden of proving that the company's identity should be disregarded to prevent fraud or injustice to the plaintiff. *Id*.

As in *Thomas & Thomas Court Reporters v. Switzer, supra*, we also look to cases involving corporations to consider the evidence necessary to pierce the veil of a corporation or a limited liability company.

### 1. PIERCING LIMITED LIABILITY COMPANY'S VEIL

Perkins argues that the district court erred in failing to pierce RMR's limited liability company veil "because RMR was insolvent when it took Perkins' funds and Ryan directed those funds in a manner that benefitted Ryan personally." Brief for appellant at 16. Perkins points to "several badges of fraud" committed by Ryan, including RMR's insolvency in early 2022, Ryan's

choice to pay creditors other than Xtreme, and Ryan's choice to use the funds in a way that personally benefited himself. *Id*. at 17.

Generally, a corporation is viewed as a complete and separate entity from its shareholders and officers, who are not, as a rule, liable for the debts and obligations of the corporation. *Christian v. Smith, supra*. A court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. *Id.* A corporation's identity as a separate legal entity will be preserved, as a general rule, until sufficient reason to the contrary appears. *Id.* However, "A court of equity will not permit corporate forms to serve as a cloak and a shield to the perpetration of a fraud, but will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of innocent parties, or to circumvent fraud." *Workman v. Workman*, 174 Neb. 471, 501, 118 N.W.2d 764, 782 (1962).

A plaintiff seeking to pierce the corporate veil must allege and prove that the corporation was under the actual control of the shareholder and that the shareholder exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights. *Christian v. Smith, supra.* A plaintiff seeking to impose liability for a corporate debt on a shareholder has the burden to show by a preponderance of the evidence that the corporate identity must be disregarded to prevent fraud or injustice to the plaintiff. *Id.*

Some of the relevant factors in determining whether to disregard the corporate entity on the basis of fraud are (1) grossly inadequate capitalization, (2) insolvency of the debtor corporation at the time the debt is incurred, (3) diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, and (4) the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity. *Id.*

"The circumstances or factors to determine the existence of fraud . . . are analogous to the 'badges, signs, indicators, or indicia of fraud.'" *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 498, 391 N.W.2d 110, 115 (1986) (internal citation omitted) (reversing district court's judgment declining to pierce corporate veil and remanding with direction to enter judgment against sole shareholder of corporate entity). Although badges of fraud "'may not be conclusive and may be strong or weak according to the nature and number involved in a particular transaction, concurrence of several such badges provides a strong inference of fraud.'" *Id*. at 499, 391 N.W.2d at 115 (quoting *Gifford-Hill & Co. v. Stoller*, 221 Neb. 757, 380 N.W.2d 625 (1986)).

(a) Inadequate Capitalization

The first element of the test, inadequate capitalization, means capitalization very small in relation to the nature of the business of the corporation and the risks entailed. *Christian v. Smith, supra.* Inadequate capitalization is measured at the time of incorporation. *Id.* A corporation which was adequately capitalized when formed but which has suffered losses is not necessarily undercapitalized *Id.* Undercapitalization presents a question of fact that turns on the nature of the business of the particular corporation. *Id.*

As stated in *J. L. Brock Bldrs., Inc. v. Dahlbeck, supra*:

A corporation's financial responsibility to creditors affected by the corporation's inadequate capitalization is discussed in 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 44.1 at 528 (rev. perm. ed. 1983):

"The attempt to do corporate business without providing any sufficient basis of financial responsibilities to creditors . . . will be ineffectual to exempt the stockholders from corporate debts. . . . Stockholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is ground for denying the separate entity privilege."

*J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. at 499-500, 391 N.W.2d at 116 (finding corporate entity to be grossly inadequately capitalized; but, stating that inadequate capitalization, by itself, was insufficient to prove fraud).

The district court in the present case found that there was "no evidence that RMR was grossly undercapitalized at the time it was formed." Although the evidence was lean on this point, there was evidence that at its formation in 2019, RMR already owed money to the Rezacs on a separate project. According to Critser, at the "very beginning of RMR," Ryan had already been working on a building involving . . . [the Rezacs] and Ryan "got . . . upside down on the project." It was during that time Critser was introduced to Ryan to "try to help him out" and "then we partnered up." That project "was going on . . . the very beginning of RMR," Ryan was "over budget," and the Rezacs were "sticking it to him as far as paying the bills." According to Critser, "[A]ll that stuff was coming out of RMR's pocket, even though it wasn't an RMR Building Group project." He added, "So obviously being a young group, we were struggling financially from the beginning, especially when you're paying for a job that wasn't part of the building group." Critser talked to the Rezacs about loaning money to Ryan and RMR. RMR, Ryan, and Critser entered into a promissory note with the Rezacs in June 2020 for $52,800. And because the Rezacs did not trust Ryan would pay them back, they required both Ryan and Critser to personally guarantee the loan. Critser explained that "it's tough to start a company" and there were financial issues, so Critser "signed on" so the company "wasn't shut down right away with paying out-of-pocket costs that it didn't have."

Whether or not RMR was "grossly" undercapitalized, this evidence at least demonstrates inadequate capitalization at the time RMR was formed, given RMR's immediate situation of being "over budget" and "upside down" on the Rezac project, which pre-existed the formation of RMR. Ryan and Critser personally guaranteed that note, which Critser was agreeable to doing so the company "wasn't shut down right away with paying out-of-pocket costs that it didn't have." The evidence supports RMR being undercapitalized at its inception. However, we are mindful that this evidence alone would not be sufficient to disregard the corporate entity. See *J. L. Brock Bldrs., Inc. v. Dahlbeck, supra.*

(b) Was Company Insolvent?

The second factor used to determine whether a corporation's identity should be disregarded is whether the corporation was insolvent at the time the debt was incurred. *Christian v. Smith*, 276 Neb. 867, 759 N.W.2d 447 (2008). A corporation is insolvent if it is unable to pay its debts as they

become due in the usual course of its business, or if it has an excess of liabilities of the corporation over its assets at a fair valuation. *Id.* Whether a corporation is insolvent is usually a question of fact. *Id.*

The district court found that there was no evidence that RMR was "insolvent at the time the debt was incurred." We disagree. On February 22, 2022, RMR deposited the $709,633.16 check received from Perkins. Rather than pay the $526,236 owed to Xtreme as represented in the invoicing to Perkins, Ryan made the decision to pay other debts contrary to industry standards and indicative of his inability to pay all his debts as they became due in the usual course of business. Ryan testified that he was letting employees go from March to October, and that the corporation was closed and had no assets. Notably, after receiving the $709,633.16 check from Perkins, Ryan paid $352,000 on February 25 to Xtreme for an unrelated project; $24,261.51 and $1,559.07 to the Rezacs to pay off the promissory note on which he was personally obligated; $7,500 and $5,000 for "work on a lawsuit" in which he was personally involved; another $17,371 to Xtreme that Ryan could not explain; rent payments to an entity in which Ryan held a 50 percent interest; $72,500 which he was "not sure" what that paid for; and thousands of dollars in payroll, including his own salary into November despite "wind[ing] things up at RMR" in "early April." Ryan confirmed that in early March of 2022, he had let a "few employees go" and that he was "hemorrhaging cash at that point." He agreed that by March 10, RMR was drawing on lines of credit to fund payroll.

Although Ryan attempts to place blame on Critser for RMR not being able to increase its line of credit to $400,000 due to the lack of signed contracts, it is evident that an increased credit line of that amount would not have satisfied RMR's outstanding debts. RMR was clearly unable to pay its debts as they become due in the usual course of its business. And there was evidence that this was an ongoing concern. Critser testified that it was "[i]rresponsible" how RMR handled its customers' funds, with Ryan not always paying the creditors for a customer's specific project. Critser knew by early March 2022 that the Xtreme invoice would not get paid because there were "only a few weeks of payroll left for the company" and he did not know how Ryan could "make up $500,000 to pay" Xtreme on Perkins' project. Critser indicated that "ever since fall of 2019 when we started," he raised the issue multiple times with Ryan and the accountant as to how the invoices were supposed to be handled on a cost-plus basis. Critser was told he "didn't know what [he was] talking about." Further, Ryan testified that RMR had no assets; thus, it had significant liabilities without any assets.

The evidence demonstrates that RMR was insolvent at the time Perkins paid $709,633.16 to RMR and the company in turn failed to pay the $526,236 owed to Xtreme on Perkins' project. As testified to by Perkins and Pelster, upon payment of funds to a contractor hired on a cost-plus basis, those funds are expected to be paid to the subcontractors and suppliers who are owed money on the project, and not to pay creditors on other projects. As Pelster opined, it constitutes "misappropriation" to use a customer's payment to pay non-project-related creditors. This practice was not consistent with the usual course of business and industry standards and supports finding that RMR was insolvent at the time the debt was incurred. This factor strongly favors piercing the limited liability company's veil.

(c) Appropriation of Funds for Personal or Improper Uses

The third factor to consider whether the corporate veil should be pierced is evidence of a diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses. *Christian v. Smith*, 276 Neb. 867, 759 N.W.2d 447 (2008). When a principal shareholder appropriates and uses corporate funds and property for his personal purposes and thereby defrauds and causes damages to creditors, the shareholder can be held individually liable for corporate debt. *Id.* Further,

> "Stockholders of an insolvent corporation cannot participate in the distribution of its assets until the claims of creditors are paid. If the assets or capital are distributed to stockholders, either directly or indirectly, or if the stockholders are allowed to withdraw assets leaving creditors unpaid, they may be compelled to repay what they have received, at the suit of creditors . . . at least to the extent necessary to realize the ratable liability of each stockholder for corporate debts, if the company has not retained sufficient assets to pay its debts. . . .
>
> The withdrawal of assets leaving debts unpaid is contrary to fundamental principles and has been designated as a fraud on creditors."

*J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 501, 391 N.W.2d 110, 116-17 (1986) (quoting 15A W. Fletcher, supra, at § 7417 at 137) (finding sole shareholder's transfer of assets to himself resulted in preferential payment to detriment of creditors; while not per se fraudulent, it may give rise to inference of fraud). In *J. L. Brock Bldrs., Inc. v. Dahlbeck, supra*, the Nebraska Supreme Court found that the sole shareholder's action constituted "an improper use of corporate funds, an injustice perpetrated by a shareholder." *Id*. at 502, 391 N.W.2d at 117.

In the present case, the district court concluded that the "evidence put forth to establish that Ryan diverted the assets of RMR for an improper or personal use falls short." It found that there was no evidence that Ryan "absconded with any funds, whether funds of [Perkins] or anyone else." The court observed that Ryan's salary was "not an exorbitant salary" and that it was "less than what RMR paid its project managers." The court stated, "There is no evidence any RMR funds were used to pay anything other than legitimate debts of RMR," including the "payment of the promissory note to the Rezacs, and paying mortgage payments for RMR/Mercury I-80, LLC." The court cited to *407 N 117 Street v. Harper*, 314 Neb. 843, 993 N.W.2d 462 (2023) to find that Ryan's payment of certain bills that he had personally guaranteed "did not weigh in favor of veil piercing."

However, in *407 N 117 Street v. Harper, supra*, the case relied upon by the district court regarding this factor, the parties being sued were nonshareholders of the corporation at issue; the defendants claimed they had no decisionmaking authority at the time a lease at issue was executed. The same is not true in the present case; rather, Ryan was the sole member and ultimate decisionmaker for RMR, making the *Harper* case distinguishable.

Perkins alleges that the payments to Lisa Rezac for the promissory note and to RMR/Mercury I-80 for rent constitute a misuse of RMR funds because Ryan personally guaranteed debts for both and held a 50 percent interest in the latter. Perkins cites to *Moss v. Associated Underwriters*, 28 Neb. App. 739, 948 N.W.2d 273 (2020), where this court upheld the district

- 13 -

court's order piercing the corporate veil in a case involving a corporation with a sole shareholder. Although this court concluded that the district court had erred in finding the corporation at issue to be undercapitalized, we agreed that the corporation was insolvent at the time the debt was incurred and that its debts exceeded its assets. We further determined that the sole shareholder used corporate assets for his own benefit by applying the corporation's funds to pay off a business loan that he had personally guaranteed.

In this case, as discussed above, RMR was insolvent at the time it received the $709,633.16 check from Perkins. It had more liabilities than assets and was unable to pay its debts as they became due in the usual course of business. See *Christian v. Smith, supra*. Ryan testified that the Perkins check was deposited into RMR's general operating bank account on February 22, 2022. Ryan confirmed that by early March, he had let a few employees go and that he was "hemorrhaging cash at that point." RMR was drawing on lines of credit to fund payroll. And instead of paying the amounts owed to Xtreme on the Perkins' project with the money received from Perkins for that purpose, Ryan instead elected to pay other debts owed, including obligations for which he had a personal interest. Notably, the debt payment to the Rezacs was not entirely a debt accrued by RMR. Although RMR did execute a promissory note with the Rezacs, it was the result of Ryan already being "upside down" on the Rezac project, which pre-existed the formation of RMR. According to Critser, "[A]ll that stuff was coming out of RMR's pocket, even though it wasn't an RMR Building Group project." RMR was "struggling financially from the beginning," in part because it was "paying for a job that wasn't part of [RMR]." When Ryan received the substantial payment from Perkins, he was "hemorrhaging cash," letting employees go, and drawing on lines of credit to fund payroll. Ryan intentionally used the Perkins' deposit to pay off debts in which he was personally accountable or had an ownership interest. There were also amounts paid for legal fees which were not fully explained, as well as $72,500 for which Ryan could not recall its purpose. Ryan also continued to pay himself a total of $39,000 in salary after the Perkins' payment. When a principal shareholder uses corporate funds for his personal purposes, the shareholder can be held individually liable for corporate debt. See *Christian v. Smith, supra*. Although we agree with the district court that not all payments made by Ryan from the Perkins' deposit were for personal or improper uses, the fact that some were made for his personal benefit supports weighing this factor in favor of piercing the limited liability company's veil.

### (d) Was Company Facade for Personal Dealings?

We turn now to the fourth prong of the test. If the corporation is a facade for the personal dealings of the shareholder and the operations of the corporation are carried on by the shareholder in disregard of the corporate entity, the shareholder may be individually liable for corporate debt. *Christian v. Smith, supra*. The separate entity concept of the corporation may be disregarded where the corporation is a mere shell, serving no legitimate business purpose, and is used as an intermediary to perpetuate fraud on the creditors. *Id.*

The district court found that there was "no evidence that RMR was a mere facade for Ryan's personal dealings." We agree. There is no evidence in the record to support that RMR was created to serve no legitimate purpose.

- 14 -

(e) Most Factors Support Piercing Company's Veil

In summary, the evidence presented at trial supports that (1) RMR was inadequately capitalized from its inception, (2) RMR was insolvent at the time it solicited payment from Perkins for the Xtreme invoice of $526,236 in January 2022, and (3) Ryan used funds from the Perkins' payment/deposit of $709,633.16 on February 22 for improper uses from which he personally benefitted. The only factor that weighs against piercing the company's veil is that the evidence does not support that RMR was created solely as a mere facade for Ryan's personal dealings.

A limited liability company's identity should be disregarded if the company has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. See *Christian v. Smith*, 276 Neb. 867, 759 N.W.2d 447 (2008). While the district court found Ryan's decision to use the Perkins' funds "in contravention of industry standards regarding a cost[-]plus arrangement," it nevertheless concluded that this was "nothing more than a prioritization to pay other RMR obligations." The court concluded that "[h]olding Ryan personally liable given the facts of this case would raise serious questions of whether anyone can rely upon the long-standing protection afforded by incorporation or the formation of a limited liability company."

However, as previously stated by the Nebraska Supreme Court, "A court of equity will not permit corporate forms to serve as a cloak and a shield to the perpetration of a fraud, but will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of innocent parties, or to circumvent fraud." *Workman v. Workman*, 174 Neb. 471, 501, 118 N.W.2d 764, 782 (1962). When examining the evidence in the present case, we conclude that three of the four factors discussed above support disregarding the limited liability company's veil. These same three factors were persuasive on appeal in *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986). In that case, the plaintiff obtained a money judgment against a corporation, but the district court declined to pierce the corporate veil to impose liability on the sole shareholder. The Nebraska Supreme Court concluded that the corporate entity in that case should be disregarded when considering the same three factors we found persuasive in the present case. The Supreme Court reversed and remanded the matter with directions to enter judgment in favor of the plaintiff against the sole shareholder. We do the same here.

2. TORTIOUS ACTS

Perkins also contends that the district court "erred in not finding Ryan independently liable as a tortfeasor" for fraud and conversion. Brief for appellant at 20. Where a tort action is brought against an officer or director, there is no need to pierce the corporate veil and liability will be imposed if the elements of the tort are satisfied. *Huffman v. Poore*, 6 Neb. App. 43, 569 N.W.2d 549 (1997).

Because we have concluded that the evidence supported piercing the limited liability company's veil to allow for personal liability against Ryan, we need not address these additional arguments made by Perkins. See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024) (appellate court not obligated to engage in analysis not necessary to adjudicate case before it).

- 15 -

## VI. CONCLUSION

For the foregoing reasons, we reverse the district court's October 30, 2023, order, with directions to enter its judgment in favor of Perkins against RMR and Ryan jointly and severally in the amount of $549,916.58, plus prejudgment interest and costs.

REVERSED AND REMANDED WITH DIRECTIONS.